AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Central District of California

| | | |
|---|---|---|
| United States of America<br>v.<br>AMAN MEHNDIRATTA,<br>and AMAN KHEIRA<br><br>_Defendant(s)_ | ) ) ) ) ) ) ) ) | Case No.<br><br>19 MJ00858 |

FILED
CLERK, U.S. DISTRICT COURT
MAR - 5 2019

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __November 2015 to February 2018__ in the county of __Orange and San Luis Obispo__ in the __Central__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § § 1343, 2 | Wire Fraud, Aiding and Abetting and Causing an Act to be done |

This criminal complaint is based on these facts:
Please see attached affidavit.

☐ Continued on the attached sheet.

/s/
_Complainant's signature_

Benjamin Platts, Special Agent
_Printed name and title_

Sworn to before me and signed in my presence.

Date: MAR - 5 2019

_Judge's signature_

City and state: ____Los Angeles, California____    PAUL L. ABRAMS, United States Magistrate Judge
_Printed name and title_

LODGED
2019 MAR -5 AM 10: 45

## AFFIDAVIT

I, Benjamin Platts, being duly sworn, declare and state as follows:

### I. INTRODUCTION

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since August 2016. I am currently assigned to the Los Angeles Division's Santa Maria Resident Agency. My responsibilities include conducting investigations of complex financial crimes, including bank fraud, money laundering, embezzlement, mortgage fraud, mail/wire fraud, bankruptcy fraud, and identity theft. I completed a twenty-two week basic field training course at the FBI Academy in Quantico, Virginia. That course contained over 800 hours of training, including training on conducting investigations of financial and cyber-based offenses. I have also attended specialized training that includes the FBI Complex Financial Crimes Conference. Since becoming a Special Agent, I have been responsible for and have actively participated in numerous white collar investigations, and, in so doing, have used a variety of investigative techniques, including interviewing witnesses and targets of the investigation, serving subpoenas and analyzing the documents obtained thereby, preparing and executing search warrants, analyzing financial records and public records, and conducting surveillance, among others. Prior to becoming an FBI Special Agent, I worked as a Police Officer for the City of Northglenn, Colorado, for

approximately five and a half years and, in that capacity, investigated numerous complaints of financial crimes.

## II. PURPOSE OF AFFIDAVIT

2. This affidavit is made in support of a criminal complaint against, and arrest warrants for, AMAN MEHNDIRATTA ("MEHNDIRATTA") (born in Gurgaon, India on January 19, 1989) and AMAN KHEIRA ("KHEIRA") (place and date of birth currently unknown) for a violation of Title 18, United States Code, Sections 1343, 2 (Wire Fraud).

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all of my knowledge of, or investigation into, this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. STATEMENT OF PROBABLE CAUSE

### A. Technical-Support Fraud Schemes

4. Based upon my training and experience and my discussions with other FBI SAs and law enforcement officials, I am aware of a common type of telemarketing fraud called a technical-support fraud scheme. In such a scheme, telemarketers, often based in other countries, make contact with consumers either by cold-calling them or by using pop-up internet messages disguised as security alerts on computers or

2

other electronic devices that direct consumers to immediately call a telephone number to protect their computer or other electronic device. The pop-ups and telemarketers falsely claim that a virus has infected the consumer's computer or that hackers are infiltrating the consumer's computer. Telemarketers often falsely claim to work for or be affiliated with large, well-known technology companies.

5. Based upon my training and experience and my discussions with other FBI SAs and law enforcement officials, I know that, regardless of the initial method of contacting a consumer, technical-support fraud schemes proceed similarly once a telemarketer working in connection with a scheme has the consumer on the phone. Emphasizing the need for immediate action, the telemarketer falsely claims that he or she can assist the consumer in fixing the virus or hacking infiltration, but first needs remote access to the consumer's computer. Once remotely connected, the telemarketer falsely purports to confirm the existence of a serious computer virus or other threat to the consumer's device, sometimes claiming that a hacker can or will soon be able to access the consumer's personal information, including financial account numbers, social security numbers, and passwords. Imparting a sense of urgency, the telemarketer then claims that he will install expensive and high-quality network security software to resolve the threat in exchange for a substantial sum of money. In reality, if the telemarketer installs anything, it typically consists of software available for free online.

6. After the telemarketer falsely purports to have installed high-quality network security software, he instructs the consumer to pay by check, wire transfer, or credit card. The cost to the consumer ranges from several hundred to thousands of dollars.

7. Based upon my training and experience and my discussions with other FBI SAs and law enforcement officials, I know that, at times during most schemes, consumers who have already paid once for purported technical support receive subsequent calls from telemarketers working for the scheme, during which calls the telemarketers concoct new phony reasons why the consumer must purchase additional security software to avoid a new serious computer virus or other threat to the consumer's device.

B. **Evidence that MEHNDIRATTA and KHEIRA have Engaged in a Technical-Support Fraud Scheme**

   1. <u>Overview</u>

8. Based on interviews of witnesses, discussions with other law enforcement agents and my examination of various reports and records, I have learned that MEHNDIRATTA and KHEIRA participated in a technical-support fraud scheme using the services of a United States resident named Parmjit Brar ("Brar"). Brar received victim payments and transmitted the payments, less the amount Brar kept for his efforts, to MEHNDIRATTA and KHEIRA. As directed by MEHNDIRATTA and KHEIRA, Brar received technical-support fraud victim payments in the

names of two California entities, Avangatee Services, LLC, ("Avangatee") and Genius Technologies, LLC ("Genius").

    2.   <u>Victim R.G.</u>

    9.   On October 18, 2017; October 30, 2017; and December 13, 2017, I interviewed R.G., a 74-year-old man residing in Nipomo, within the Central District of California. R.G. told me the following:

    a.   R.G. is a widowed retiree who lives by himself and does not have children.

    b.   In November 2015, R.G. received an unsolicited telephone call from a male who R.G. believed spoke with an "Indian" accent. The caller identified himself as "John Watson" ("Watson"). Watson told R.G. that R.G's computer had been hacked and that R.G. needed to install updated security software on the computer. On February 27, 2019, I interviewed FBI SA Dieter Willkomm, an FBI certified Computer Analysis Response Team examiner. SA Willkomm advised, based on his training and experience, that it was highly unlikely that a telemarketer in India (or anywhere else) with no prior connection to a United States consumer could know that the consumer's computer had been subject to a virus or hacking attack.

    c.   R.G. allowed Watson to access his computer via a remote login connection. Watson pointed to purported evidence on R.G.'s computer that showed "evidence of hacking" on his computer. Watson showed R.G., who says that he is not at all technologically savvy, retail prices for virus products that ranged between $50,000 and $150,000. Based upon these

comparisons, R.G. believed that the price Watson was charging for security software was a good deal. Based on my training and experience, I know that there are no legitimate individual consumer virus protection programs that cost even close to the amounts quoted by Watson.

   d. That same day, R.G., as directed by Watson, mailed from Nipomo a $12,000 check to a post office box in San Leandro, California, for the purpose of purchasing a "Dell Firewall." In the following months, Watson, representing himself to be working for Avangatee, continued to contact R.G. through calls or e-mails to solicit additional funds for purported computer security. R.G. sent from Nipomo to the same San Leandro post office box a number of checks made payable to, and wires for the benefit of, Avangatee purportedly for upgraded security software, new security certificates, and "lifetime security." At one point, R.G. contacted Watson because he believed the security icons were no longer on his computer. Watson told R.G. that hackers had accessed his computer and wiped out the "security." Watson further said that the license for the security software was for one use only so R.G.'s computer was no longer protected. Watson instructed R.G. to send $63,000 via wire transfer to pay for a new license for the security software.

   e. Between November 21, 2015, and September 22, 2017, R.G. mailed from Nipomo checks totaling approximately $144,700, made payable to Avangatee at the San Leandro post office box. Between September 5, 2017, and October 3, 2017,

R.G. originated 13 wire transfers from Nipomo totaling approximately $333,999 to various beneficiary accounts located outside of California at the direction of Watson. For example, on or about September 22, 2017, Watson instructed R.G. to send $16,000 to pay for the technical support services that he was purportedly providing through Avangatee. Based on this instruction, R.G. caused $16,000 to be wired from Bank of America, N.A., account number XXXX-XXXX-2877, in Nipomo to Axis Bank Limited account number XXXX-XXXX-XXX-7563, in New Delhi, India, for the benefit of MEAC Solutions.[1]

      f.    On October 27, 2017, R.G. called Watson and told him he wanted a refund because his computer files had still not been restored as promised. After some back-and-forth between R.G. and Watson, Watson said he would secure a refund for R.G. However, Watson said that his company had a policy of not allowing a refund check to be issued for under $520,000. Therefore, Watson told R.G. to send Avangatee an additional $160,000, which would bring the total amount paid by R.G. to $521,000. Watson reiterated that R.G. would not receive a refund if he did not first send the $160,000 to Avangatee. R.G. received a "written agreement" from Watson via the Notepad application on his computer.

      g.    I have reviewed the agreement received by R.G. as described in subparagraph (f), above. The agreement had numerous misspellings and grammatical errors, but stated that,

---

[1] As explained in paragraph 11(f) and footnote 2, below, I believe that MEAC Solutions is a company controlled by MEHNDIRATTA.

once Avangatee received $160,000, it would send R.G. a check for $561,000. As of my last interview with R.G. on December 13, 2017, he had still not received any refund from Watson or Avangatee.

    h.    At the close of the interview on December 13, 2017, I asked R.G. to inform me of any further developments regarding these matters, including any interactions with Watson or related parties. To date, R.G. has not informed me of any subsequent contacts.

    3.    <u>Victim S.K.</u>

    10.    I have reviewed information regarding an interview by FBI SAs of C.K., who is S.K.'s sister, and bank account records for S.K., Avangatee and Genius, through which I have been informed of the following:

    a.    S.K. is a 68-year-old man residing in Hawaii. S.K. suffers from dementia.

    b.    S.K. provided approximately $356,000 to Avangatee and Genius via checks and wire transfers. S.K. made the payments at the direction of representatives of Avangatee and Genius, and the payments were made for services that purportedly would "fix" and "protect" S.K.'s computer. For example, on January 10, 2016, S.K. mailed a $14,990 check made payable to Avangatee to the same San Leandro post office box referenced in paragraph 9(d) above. The check was deposited into an Avangatee bank account. On August 5, 2016, S.K. mailed another check for $24,999 made payable to Avangatee to the same San Leandro post

office box. The check was deposited into another Avangatee bank account.

4. MEHNDIRATTA and KHEIRA Control Avangatee and Genius

11. On April 11, 2018, and again on January 10, 2019, another FBI SA and I interviewed Brar. Brar provided the following information about his interactions with MEHNDIRATTA and KHEIRA:

a. Brar explained that he founded Avangatee and Genius at the direction of KHEIRA (spelled "Khaire" by Brar in his April 11, 2018, interview but identified as KHEIRA by Brar on January 10, 2019. Brar stated that "Khaire" and "Kheira" are the same individual) and MEHNDIRATTA.

b. According to Brar, in 2015, Brar's nephew had placed him in contact with KHEIRA, MEHNDIRATTA, and one other individual, who were looking for a United States citizen to help them operate a technical-support business with customers in the United States. Based on my training and experience, and my conversations with other law enforcement agents, I know that individuals located in foreign countries who are perpetrating schemes to defraud United States residents often set up shell companies in the United States to falsely assure prospective victims that they are doing business with United States companies subject to United States laws and other consumer protections.

c. Brar initially spoke with KHEIRA about the business opportunity, and KHEIRA referred Brar to MEHNDIRATTA to

9

address questions about taxation and mailing logistics. In their conversation, MEHNDIRATTA told Brar that India would take care of the taxes involved in the business opportunity and Brar's only job would be to keep his $4,000 per month and send the rest of the monies received to India.

      d.    Brar understood from MEHNDIRATTA and KHEIRA that there were other people and companies in the United States serving the same role as Brar, that is, they were receiving customer funds and forwarding them to MEHNDIRATTA and KHEIRA in India.

      e.    KHEIRA and MEHNDIRATTA advised Brar that they needed his credit card information to pay approximately $400 in business startup fees. Throughout the scheme, Brar spoke with and received instructions from both MEHNDIRATTA and KHEIRA. Based on conversations he had with them, he understood that MEHNDIRATTA was the boss of the operation.

      f.    Brar stated that Avangatee was the first business established through his engagement with MEHNDIRATTA and KHEIRA. Brar explained that, after Avangatee was established, he began receiving payments from individuals across the United States in wide-ranging amounts. Brar further stated that he was instructed by MEHNDIRATTA and KHEIRA to wire the monies to companies registered to and controlled by MEHNDIRATTA. Three such companies were Prime Tech Solutions, Ltd.; Marvel Corporate

Services; and Genius Technologies, Ltd.[2] Brar performed no activities in connection with the purported underlying computer technical support services business of Avangatee and was not aware of any other operations that Avangatee maintained in the United States.

  g. Although Brar initially wired the funds to MEHNDIRATTA's companies, he later provided MEHNDIRATTA an on-line code to access the funds directly from Brar's account in the United States. Brar also advised that MEHNDIRATTA and KHEIRA had access to his online bank accounts, pin numbers, and certain e-mail accounts. Brar understood that most of the funds that he sent or made available to MEHNDIRATTA were received in India, although some of the funds also went to Singapore and Hong Kong. MEHNDIRATTA told Brar that funds were being sent to countries other than India for taxation reasons.

  h. Brar communicated with MEHNDIRATTA and KHEIRA by cellular telephone, but his primary method of communication with them was via the WhatsApp mobile online messaging application. Brar regularly received wiring amount instructions and exchanged bank remittance codes via WhatsApp with MEHNDIRATTA and KHEIRA.

  i. MEHNDIRATTA instructed Brar to also pay KHEIRA a monthly finder's fee of $1,000. MEHNDIRATTA told Brar that if he paid this fee to KHEIRA, MEHNDIRATTA would increase Brar's compensation to $2,000 per week ($8,000 per month). Brar agreed

---

[2] Based on my training and experience, I believe that MEAC Solutions, to which R.G. was instructed to send funds for the technology-support services purportedly being provided by Avangatee (see paragraph 9(e), above), was also a company controlled by MEHNDIRATTA.

and began paying KHEIRA $1,000 per month via Western Union transmissions under different names. The different names were provided by KHEIRA each month prior to receiving the $1,000 finder's fee.

j. As the business progressed, Brar demanded $4,500 per week because of the volume of money he was receiving and transmitting to MEHNDIRATTA's companies. Brar received this increase and began receiving $4,500 per week. When this occurred, KHEIRA demanded an increase of his monthly finder's fee payment to $1,200.

k. At one point, a lawyer from a company with a name that was similar to Avangatee sent a cease and desist letter regarding use of the Avangatee name. I have seen a copy of this letter, which is dated November 2015. The letter stated that Avangatee was committing trademark infringement. It also stated that Avangatee offered "sham technical support services with the intent to extort money from individuals for the repair of allegedly damaged computers."

l. Brar informed MEHNDIRATTA and KHEIRA of the letter, and they instructed him to close the company and its website, and said that he should use another company instead. A new company - Genius - was created and Brar began receiving payments in the name of Genius from victims. He handled these in the same way as he handled the payments for Avangatee - depositing them, keeping his commission, and forwarding the rest to MEHNDIRATTA and KHEIRA.

m. Brar stated that, whenever he received a complaint about the business, he would consult with either MEHNDIRATTA or KHEIRA and that they would then provide him with instructions via WhatsApp. Some of these complaints came directly from consumers and some came from state Attorneys General.

n. In 2016, Brar arranged to travel to India for personal reasons and asked MEHNDIRATTA and KHEIRA to visit their office. Brar anticipated meeting with MEHNDIRATTA, KHEIRA, and a third individual at their office but, instead, all three met him at the airport. The men advised that they would bring Brar by the office before his trip ended, but when Brar attempted to see the office before departing, KHEIRA told Brar that MEHNDIRATTA was out of the area so it was not going to happen.

o. During his interview, Brar stated that he had found a reference on the internet to a case against MEHNDIRATTA and Linda Massey. Brar recalled that the case was a 2017 civil case. I believe Brar is mistaken about certain details because, on February 21, 2019, I performed internet searches for MEHNDIRATTA and Massey and came across articles from 2016, not 2017, referencing a criminal, not civil, case against MEHNDIRATTA and Massey.[3]

---

[3] Brar was likely referring to United States v. Mehndiratta and Massey, 8:16-cr-50-BHH (D.S.C.), a criminal case from 2016. I have reviewed the docket for this federal criminal case filed in South Carolina, and have learned the following: On January 12, 2016, an indictment was returned charging AMAN MEHNDIRATTA and Linda B. Massey ("Massey") with money laundering conspiracy,

13

p. Brar stated that, according to what he saw on the internet, Linda Massey was similar to Brar in the business she operated and the relationship she had with MEHNDIRATTA.

q. Upon seeing references to the case against MEHNDIRATTA, Brar questioned KHEIRA about the case, and KHEIRA advised that he knew about it, but everything related to the case had been resolved. Based on my review of the docket for the criminal case, as discussed in footnote 3, above, I understand that the criminal case against MEHNDIRATTA remains open and unresolved.

r. Brar stated that, at the end of 2017, he decided to end his relationship with KHEIRA and MEHNDIRATTA.

---

in violation of 18 U.S.C. § 1956(h). The indictment alleges, as part of the manner and means of the conspiracy, that:

> MEHNDIRATTA and/or other unidentified coconspirators operating at his direction would contact victims either telephonically or through the internet. The victims are falsely informed that their computers have been infected by malicious software and that the unidentified coconspirator needs to gain access to the computers to confirm the infection. The unidentified conspirator is granted computer access and then places a number of unwanted/useless software programs on the victims' computers. The unidentified coconspirator then solicits payment for the software and subsequent computer monitoring that is mailed to an address under the custody and control of [Massey].
>
> . . .
>
> Upon receipt of the checks from the victims [Massey] deposits them in the bank.
>
> The money received from the victims, less the amount kept by [Massey] for her efforts, is then wired to MEHNDIRATTA.

In May 2016, Massey pleaded guilty to count two of the indictment, which charged her with engaging in an unregistered money transmitting business, in violation of 18 U.S.C. § 1960(a), and was sentenced to six months in prison. MEHNDIRATTA has never appeared to answer the charges.

14

## IV. CONCLUSION

12. For all the reasons described above, there is probable cause to believe that AMAN MEHNDIRATTA and AMAN KHEIRA have participated in a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, and have used and caused to be used wirings in interstate and foreign commerce to carry out an essential part of the scheme, thereby committing a violation of 18 U.S.C. §§ 1343, 2.

/S/
_____
Benjamin Platts, Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
this 5th day of March, 2019.

_____
HONORABLE PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE